# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS W. HOOK and PATTI HOOK, | ) | CIVIL ACTION NO. 3:15-281 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| WHITING DOOR MANUFACTURING | ) | |
| CORP. and C & S WHOLESALE | ) | |
| GROCERS, INC., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOBILE TRAILER MAINTENANCE, LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION

## I.     Introduction

Before the Court are three Motions for Summary Judgment filed by Defendant and

Third-Party Plaintiff Whiting Door Manufacturing Corp. (ECF No 69), Defendant-

Crossclaimant C & S Wholesale Grocers, Inc. (ECF No. 78), and Third-Party Defendant

and Crossclaim-Defendant Mobile Trailer Maintenance, LLC (ECF No. 80). These motions

are fully briefed (*see* ECF Nos. 70, 79, 81, 90, 91, 92) and are ripe for disposition.

Also before the Court are two Motions *in Limine* filed by Defendants Whiting Door

Manufacturing Corp., C & S Wholesale Grocers, and Mobile Trailer Maintenance, LLC.

(*See* ECF Nos. 72, 75, 77, 84, 85.) These motions are fully briefed (*see* ECF Nos. 73, 76, 87,

94) and are ripe for disposition.

This is a personal-injury lawsuit arising from injuries that Plaintiff Thomas W. Hook sustained while employed as a truck driver. (ECF No. 82 ¶ 1; ECF No. 88 ¶ 1.) Mr. Hook was injured when the pull strap on the trailer's rear rolling door detached, causing Mr. Hook to fall from the trailer's rear entrance to the ground and sustain injuries. (ECF No. 70 at 1; ECF No. 82 ¶¶ 18-20.)

Mr. Hook and his wife, Patti (collectively "Plaintiff"),[1] filed this lawsuit against the trailer door's manufacturer—Whiting Door Manufacturing Corp. ("Whiting Door")—and the trailer's owner—C & S Wholesale Grocers, Inc. ("C & S Grocers"). (*See* ECF No. 1.) Whiting Door and C & S Grocers then filed third-party claims against the company that replaced and maintained the strap on the trailer door—Mobile Trailer Maintenance, LLC ("MTM"). (ECF No. 82 ¶ 14.)

## II.    Jurisdiction and Venue

The Court has subject-matter jurisdiction over the claims, third-party claims, and crossclaims in this case under 28 U.S.C. § 1332(a)(1) because it involves citizens of different states and the amount in controversy exceeds $75,000. Mr. and Mrs. Hook are residents of Clarion, Pennsylvania. (ECF No. 1 ¶ 1.) Whiting Door is a New York corporation with its principal place of business in New York. (*Id.* ¶ 2.) C & S Grocers is a New Hampshire corporation with its principal place of business in New Hampshire. (ECF No. 39 ¶ 3.)

---

[1] While the Court recognizes that Mr. Hook and his wife filed this lawsuit, the Court collectively refers to Mr. and Mrs. Hook as "Plaintiff" or "Mr. Hook" throughout. The Court uses Mrs. Hook's name when she is specifically referred to.

MTM is a Maryland limited liability company with a principal place of business in Maryland. (ECF No. 44 ¶ 3.) MTM's sole member, Rob Garrity, is a resident of Garnet Valley, Pennsylvania. (ECF No. 50 ¶ 4.) The Court has subject-matter jurisdiction over the claims Whiting Door and C & S Grocers bring against MTM under 28 U.S.C. § 1367 because these claims arise from the same transaction and occurrence as Mr. Hook's claims against Whiting Door and C & S Grocers.

Because a substantial part of the events giving rise to the claims in this case occurred in the Western District of Pennsylvania, venue is proper in this district under 28 U.S.C. § 1391(b)(2).

## III.    Procedural History

Mr. Hook and his wife filed this lawsuit on October 30, 2015. (ECF No. 1.) Mr. Hook brings products-liability claims against Whiting Door under negligence (Count I) and strict liability (Count II) theories and a negligence claim against C & S Grocers (Count III). (*Id.*) Mrs. Hook brings loss of consortium claims against both Whiting Door (Count IV) and C & S grocers (Count V). (*Id.*) Whiting Door then filed a third-party complaint against MTM for contribution and indemnification. (ECF No. 44.) Similarly, C & S Grocers filed an amended answer to assert a crossclaim against MTM. (ECF No. 57.)

On July 6, 2016, the Court entered an Order granting Defendants' Motion to Dismiss, in which the Court dismissed Mr. Hook's claims for punitive damages. (ECF No. 26.) Then, from July 2016 until early 2018, the parties engaged in discovery. (*See* ECF Nos. 52, 60, 61, 62.)

During discovery, Mr. Hook retained two experts to offer opinion testimony on the incident that led to his injuries. First, Mr. Hook retained David Kassekert, P.E., to offer opinions on the design of the trailer door's strap attachment and potential alternative designs. *(See* ECF No. 71 ¶¶ 64-77.)  Second, Mr. Hook retained biomechanical engineer Al Vangura, Jr. to offer opinions regarding the detachment of the strap and the events that could have led to Mr. Hook's injuries. *(See id.* ¶¶ 78-93.)

Whiting Door, C & S Grocers, and MTM filed Motions *in Limine* to exclude the testimony of Mr. Hook's experts, David W. Kassekert, P.E. ("Kassekert") and Albert Vangura, Jr. ("Vangura").[2] *(See* ECF Nos. 72, 73, 75, 76, 77, 84, 85.)

On August 31, 2018, C & S Grocers, Whiting Door, and MTM filed separate Motions for Summary Judgment, Briefs in Support, and Concise Statements of Material Facts. (ECF Nos. 69-71, 78-79, 80-82.) On October 1, 2018, Mr. Hook filed responses. *(See* 88-96.) Accordingly, these Motions are ripe for disposition.

## IV.  Factual History

The following facts are undisputed unless otherwise noted.[3]  The Court includes additional material facts in other sections of this opinion where necessary.

---

[2] The Motions *in Limine* were filed by Whiting Door and C & S Grocers, respectively. On the Motion *in Limine* filed by Whiting Door (ECF No. 75), C & S Grocers joined in the Motion. *(See* ECF No. 84.) Similarly, on the Motion *in Limine* filed by C & S Grocers (ECF No. 72), MTM and Whiting Door joined in the Motion. (ECF Nos. 77, 85.)

[3] The Court derives these facts from a combination of the Joint Concise Statement of Undisputed Material Facts of Defendants Whiting Door and C & S Grocers (ECF No. 71), MTM's Concise Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (ECF No. 82), and Mr. Hook's Response and Counterstatements to the Concise Statement of Material Fact by Whiting and C & S (ECF No. 88) and MTM (ECF No. 89).

Mr. Hook was employed as a truck driver by Ruan Logistics Corporation ("Ruan"). He drove a tractor trailer and made deliveries to grocery stores in the states surrounding Pennsylvania. (ECF No. 82 ¶¶ 1-2; ECF No. 89 ¶¶ 1-2.)

### A. The Trailer Door and Door Strap

During his employment at Ruan, Mr. Hook hauled a 53-foot-long enclosed trailer (the "Trailer") equipped with a rear rolling door. (ECF No. 82 ¶ 3; ECF No. 89 ¶ 3.)

Rear-rolling trailer doors are comprised of several panels connected by hinges, which are attached to a counterbalance system that allows the door to open and close by sliding upwards and downwards. (ECF No. 82 ¶ 4; ECF No. 89 ¶ 4; ECF No. 71 ¶ 3; ECF No. 88 ¶ 3.)

A pull strap is attached to the bottom panel of the rolling door. (ECF No. 82 ¶ 5; ECF No. 89 ¶ 5; ECF No. 71 ¶ 5; ECF No. 88 ¶ 5.) To close the rolling door, the operator is to pull downwards on the strap, pulling the door down approximately six inches to two feet, until the operator is able to grab the metal handle attached to the bottom panel of the door. (ECF No. 82 ¶ 7; ECF No. 89 ¶ 7; ECF No. 71 ¶ 11; ECF No. 88 ¶ 11.)

On the bottom door panel of the Trailer's rolling door, there is a label that states:

WARNING: 1. Use strap to pull door down until you can reach grab handle. Close door with grab handle; 2. Check strap and cable daily for fraying; 3. Do not pull on worn or damaged strip; 4. Do not close door on strap; 5. Latch "lock" handle open before lifting door; 6. Do not stand under door when it is moving; [and] 6. Do not move vehicle with door open.

(ECF No. 82 ¶ 9; ECF No. 89 ¶ 9; ECF No. 71 ¶ 13; ECF No. 88 ¶ 13.)

Ruan specifically trained Mr. Hook to keep his hands on the metal trailer door's grab handle and metal latch—and not the pull strap—when closing the Trailer's door. (ECF No. 82 ¶ 12; ECF No. 89 ¶ 12; ECF No. 71 ¶¶ 15-16; ECF No. 88 ¶¶ 15-16.)

Whiting Door manufactured the Trailer's door. (ECF No. 82 ¶ 13; ECF No. 89 ¶ 13; ECF No. 71 ¶ 2; ECF No. 88 ¶ 2.) The door that Whiting Door manufactured was affixed to the Trailer—number 51104128—which was owned by C & S Grocers. (ECF No. 82 ¶ 13; ECF No. 89 ¶ 13; ECF No. 71 ¶ 17; ECF No. 88 ¶ 17.) C & S Grocers routinely hired third-party servicing companies to perform service and maintenance on the Trailer and its component parts. (ECF No. 71 ¶ 20; ECF No. 88 ¶ 20.)

On September 27, 2013, MTM replaced the Trailer's pull strap.[4] (ECF No. 82 ¶ 14; ECF No. 89 ¶ 14; ECF No. 71 ¶ 21; ECF No. 88 ¶ 21.) There is no evidence that other repairs were made to the Trailer's pull strap at any other time. (ECF No. 71 ¶ 24; ECF No. 88 ¶ 24.)

## B. The November 4, 2013 Accident

On November 4, 2013, Mr. Hook hauled the Trailer from Dubois, Pennsylvania to New York to make deliveries at three grocery stores. (ECF No. 71 ¶ 28; ECF No. 88 ¶ 28.)

---

[4] This fact is partially disputed. Whiting Door, C & S Grocers, and MTM maintain that MTM replaced the strap on the trailer door during routine maintenance because the strap was ripped or torn, as indicated on an invoice and repair order that an MTM technician created. (ECF No. 82 ¶ 14; ECF No. 71 ¶ 21.) Mr. Hook admits that an invoice and repair order state that the strap was repaired because it was torn. (ECF No. 89 ¶ 14; ECF No. 88 ¶ 21.) However, Mr. Hook maintains that the technician who replaced the strap generated an invoice and repair order using a drop-down menu on a computer with limited options. (*Id.*) Mr. Hook argues that the exact reason for the repair is unclear because the technician who made this repair could not be located. (*Id.*)

Mr. Hook made the first two deliveries without any issues or problems regarding the Trailer's door.[5] (ECF No. 82 ¶ 17; ECF No. 89 ¶ 17; ECF No. 71 ¶ 30; ECF No. 88 ¶ 30.)

Mr. Hook's third and final delivery was to Maxwell's Food Store in Auburn, New York. (ECF No. 82 ¶ 18; ECF No. 89 ¶ 18; ECF No. 71 ¶ 32; ECF No. 88 ¶ 32.) Mr. Hook unloaded groceries at Maxwell's Food Store and completed the delivery. (ECF No. 82 ¶ 19; ECF No. 89 ¶ 19; ECF No. 71 ¶ 33; ECF No. 88 ¶ 33.) Mr. Hook secured empty pallets in the Trailer and walked towards the end of the Trailer. (ECF No. 82 ¶ 20; ECF No. 89 ¶ 21; ECF No. 71 ¶ 34; ECF No. 88 ¶ 34.) Mr. Hook has no memory of what occurred after he walked to the end of the Trailer. (ECF No. 82 ¶ 21; ECF No. 89 ¶ 21; ECF No. 71 ¶ 34; ECF No. 88 ¶ 34.)

Mr. Hook's next memory is his waking up in the hospital. (ECF No. 82 ¶ 22; ECF No. 89 ¶ 22; ECF No. 71 ¶ 36; ECF No. 88 ¶ 36.) When Mr. Hook did not go into Maxwell's Food Store to fill out the delivery paperwork, the store's owner, Mr. Maxwell, went outside and found Mr. Hook standing on the ground and leaning against the trailer. (ECF No. 71 ¶ 43; ECF No. 88 ¶ 43.)

Mr. Maxwell found Mr. Hook in a "dazed condition" with dirt and leaves on the back of his jacket. (ECF No. 71 ¶ 44; ECF No. 88 ¶ 44.) Mr. Maxwell also observed scrapes on the back of Mr. Hook's head. (ECF No. 71 ¶ 48; ECF No. 88 ¶ 48.) The strap from the Trailer's door was either on the ground or in Mr. Hook's hand. (ECF No. 82 ¶ 31; ECF No.

---

[5] This fact is disputed. Mr. Hook maintains that that he does not remember whether he had trouble with the Trailer's door strap because he has amnesia regarding the events of November 4, 2013. (ECF No. 82 ¶ 17; ECF No. 88 ¶ 30.)

-7-

89 ¶ 31; ECF No. 71 ¶ 45; ECF No. 88 ¶ 45.) When Mr. Maxwell found Mr. Hook, the Trailer's door was nearly closed—there was an opening of four or five inches between the Trailer's door and the bottom of the Trailer. (ECF No. 82 ¶ 33; ECF No. 89 ¶ 33; ECF No. 71 ¶ 47; ECF No. 88 ¶ 47.)

Mr. Hook did not know what occurred and asked Mr. Maxwell what happened. (ECF No. 71 ¶¶ 46-49; ECF No. 88 ¶¶ 46-49.) Mr. Hook was hospitalized and sustained injuries from this incident. (ECF No. 82 ¶¶ 24-26; ECF No. 89 ¶¶ 24-26.) However, nobody witnessed Mr. Hook sustain his injuries. (ECF No. 82 ¶¶ 36-40; ECF No. 89 ¶¶ 36-40.) In his deposition, Mr. Hook stated that "[n]obody knows what caused his injuries." (ECF No. 82 ¶ 39; ECF No. 89 ¶ 39.)

Mr. Hook's friend and co-worker took a picture of the strap that was allegedly attached to the Trailer's door on November 4, 2013.[6] (ECF No. 71 ¶ 58; ECF No. 88 ¶ 58.) At some point, the detached strap was lost. As of August 2018, the location of the detached strap is unknown and it has not been available to the parties for inspection. (ECF No. 71 ¶¶ 46, 60; ECF No. 88 ¶¶ 46, 60.)

## C.    The Expert Testimony of David Kassekert, P.E.

Kassekert is a mechanical engineer employed by Keystone Engineering Consultants, Inc. (*See* ECF No. 75-2.) Hook retained Kassekert to provide an opinion on the safety of the design of the strap attached to the Trailer's door.

---

[6] Plaintiff denies this allegation, stating that "[t]he strap was detached." (*See* ECF No. 88 ¶ 58.) However, it appears that Plaintiff misunderstood the allegation in the Concise Statement of Material Facts of C & S Grocers and Whiting Door, which merely states that Mr. Hook's co-worker took a photo of the detached strap. (*See* ECF No. 71 ¶ 58.) Accordingly, the Court will treat this fact as undisputed.

Kassekert examined the design of the door strap and offered opinions on safer alternative designs. Kassekert noted that there are two holes in the Trailer's metal door where the strap attaches to it. (*Id.* at 2.) According to the deposition testimony of one of Mr. Hook's co-workers, Mr. Hosey, the holes in the Trailer's metal door were "elongated" and "abnormally bent," which led Mr. Hosey to speculate that "[i]t looks like . . . a rivet had actually pulled out of [the holes], bending the metal." (*Id.*) Kassekert also referred to a spreadsheet that showed "a very large number of repairs to trailers to replace missing and torn pull straps." (*Id.* at 3.)

With this information, Kassekert concluded that the door strap's rivet-based design is unsafe for daily use. (*Id.*) However, Kassekert does not elaborate on this opinion or explain the safety standards upon which it is based.

Kassekert then considered possible alternative designs for the Trailer's door strap. Kassekert's report states that a better design for the strap attachment would be "to drill two holes all the way through the door and insert[] a 1/4" diameter bolt . . . through the door" and use washers and a locking nut to decrease pressure on the door. (*Id.*) Kassekert states that this method of attaching the strap would be more effective than the rivet-based design used on the Trailer. (*Id.* at 4.)

Kassekert further states that using bolts would be simple, easy, and a cheaper way to repair the strap attachment after the strap has been pulled off the door. (*Id.* at 3-4.) He states that the current design makes the door strap impossible to fix. Kassekert notes that after the strap and attached rivets are pulled through the Trailer's aluminum door once,

-9-

the distortion of the drill holes "makes a firm and permanent connection using new rivets impossible." (*Id.*) Kassekert states that a design using a bolt and washers would be a safer and more effective alternative method. (*Id.*)

In his expert report, Kassekert concluded that:

(1)     The design of the Whiting door is defective in that the method that is used to attach the pull down strap is not adequate for daily use;

(2)     A better design would be to use bolts to attach steel "buckle" and strap to the door, as is described above;

(3)     Because of the large number of trailers that were requiring repairs to replace missing and torn straps should have alerted C & S to the fact that the method that was being used to reattach the failed straps was unsafe; and

(4)     C & S should have revised their repair procedure to provide a safe and permanent connection for the replaced straps.

(*Id.* at 5.)

## D.     The Expert Testimony of Albert Vangura, Jr.

Vangura is a biomechanical engineer employed by Keystone Engineering Consultants, Inc. (ECF No. 72-2.) Hook retained Vangura to offer biomechanical-based opinions on how Mr. Hook fell from the Trailer.

Vangura used Mr. Hook's injuries and the procedure for closing the Trailer's door as a basis for his opinions on how Mr. Hook sustained injuries. Vangura calculated the force that Mr. Hook must have exerted on the door strap to pull down the Trailer's door. (*Id.* at 2.) Vangura also calculated the force required to cause Mr. Hook's injuries—namely a concussion and T12 anterior wedge fracture with mild superior endplate deformity. (*Id.*

-10-

at 1, 3-4.) Vangura based this calculation on Mr. Hook's weight, the height of the Trailer, and the velocity necessary to cause the types of injuries that Mr. Hook sustained. (*Id.* at 5.)

Vangura generally concludes that based on Mr. Hook's testimony on his procedure for closing the trailer door and the injuries he sustained, Mr. Hook "was using his right hand to pull the sliding door strap while rotating clockwise to face the door and beginning to reach for the handle with his left hand when . . . the strap abruptly dislodged[,]" causing him to fall backwards from the Trailer onto ground. (*Id.* at 5.)

Vangura also concluded that "[t]he failure of the strap to remain attached to the sliding door is a proximate cause of this incident" and that "[h]ad the strap remained attached to the sliding door, Hook would not have lost his balance causing him to fall to the ground." (*Id.* at 6.)

## V.    Legal Standard

### A.    Motions for Summary Judgment

"The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir.

-11-

2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248. The court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2005)

(noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## B.    Motions *in Limine*

"[A] motion *in limine* is a pretrial motion which requests that the Court prohibit opposing counsel from referring to or offering evidence on matters prejudicial to the moving party." *Smith v. Allstate Ins. Co.*, 912 F. Supp. 2d 242, 246 (W.D. Pa. 2012) (Gibson, J.); *Emcore Corp. v. Optium Corp.*, No. 7-326, 2009 WL 3381809, at *1 (W.D. Pa. Oct. 16, 2009). Motions *in limine* narrow the evidentiary issues for trial and eliminate unnecessary trial interruptions. *Smith*, 912 F. Supp. 2d at 246 (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990)).

A court may exercise its discretion and decide to rule on motions *in limine* on evidentiary issues in appropriate cases. *In re Japanese Elec. Pros. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983). "[A] trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds."    *Crestwood Membranes, Inc. v. Constant Servs., Inc.*, No. 3:15-cv-537, 2018 WL 490547, at *1 (M.D. Pa. Jan. 19, 2018).

## VI. Discussion

### A. Motions *in Limine* to Exclude the Testimony and Reports of Plaintiff's Experts

#### 1. Expert Testimony is Necessary in this Case

As a preliminary matter, the Court must determine whether expert testimony is

necessary for Mr. Hook to establish his claims.[7] The Third Circuit has explained that:

> expert evidence is not necessary . . . if all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation.

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000) (quoting *Padillas v. Stork-Gamco,*

*Inc.*, 186 F.3d 412, 415-16 (3d Cir. 1999)).

"A corollary to this principle is the notion that expert testimony *is* generally

required in products liability cases where a defect is alleged, unless the issues are 'simple'

and 'within the range of comprehension of the average juror.'" *Westfield Ins. v. Detroit*

*Diesel Corp.*, No. 3:10-cv-100, 2012 WL 1611311, at \*4 (W.D. Pa. May 8, 2012) (Gibson, J.)

(quoting *Oddi*, 234 F.3d at 159); *see also McCracken v. Ford Motor Co.*, 392 F. App'x 1, 3 (3d

Cir. 2010). But where the issues in a products liability case are highly technical, expert

testimony is necessary to assist the jury in understanding the claims. *McCracken*, 392 F.

App'x at 3; *Marino v. Maytag Corp.*, No. 02-2085, 2005 WL 2403638, \*3 (W.D. Pa. Sept. 29,

2005). However, at the summary judgment stage, it may be "premature to rule out that

---

[7] The parties' briefs do not address whether expert testimony is necessary in this case.

testimony and pictures may enable the jury to clearly see [how the product works] and the manner of its use, rendering expert testimony unnecessary." *Padillas*, 186 F.3d at 416.

The facts of this case fall somewhere between the facts in *Padillas* and *Oddi*— cases where the Third Circuit reached opposite conclusions on the necessity of expert testimony. In *Padillas*, the Third Circuit held that expert testimony was not necessary to assist the jury in determining that a chicken cutter with exposed blades was defectively designed because the cutter's design was so obviously dangerous. *Id.* In *Oddi*, on the other hand, the Third Circuit held that expert testimony was necessary to assist the jury in understanding whether the design of the floorboards and front bumper of a truck was defective and whether it caused the plaintiff-driver's injuries. 234 F.3d at 159.

Here, the Court finds that Mr. Hook must support his claims—that the Trailer door's defective strap caused him to fall and sustain injuries—with expert testimony. At first glance, the issues in this case seem simple enough for the jury to understand without the assistance of expert testimony. On a simple level, the jury could infer that the defective strap caused Mr. Hook to fall and sustain injuries because the strap on the Trailer door was detached after Mr. Hook fell. However, this inference is insufficient to prove causation in this case. Mr. Hook must present expert testimony to prove key aspects of his claims.

First, Mr. Hook must introduce evidence showing that the strap detached because it was defective, and that the detachment of the strap caused Mr. Hook to fall. Because nobody witnessed the accident, Mr. Hook must establish causation through expert

testimony. He must also present evidence to rule out other factors—namely Mr. Hook's misuse of the strap—that could have caused the accident.

Second, Mr. Hook must show that a safer alternative design for the strap was feasible to prevail on his design defect products liability claim. To make these determinations, the jury must rely on technical expert testimony on engineering, physics, mechanics, and design. Accordingly, the Court finds that expert testimony is necessary in this case.

## 2. Rule 702—The Admissibility of Expert Testimony

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Kannankeril v. Terminex Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). Therefore, when a party seeks to admit expert testimony, the Court must make a preliminary determination that the requirements of Federal Rule of Evidence 702 have been met. *Magistrini v. One Hour Martinizing Dry Cleaning*, 68 F. App'x 356, 356 (3d Cir. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

Under Federal Rule of Evidence 702:

a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702(a); *see also United States v. Walker*, 657 F.3d 160, 175 (3d Cir. 2011).

The Third Circuit has interpreted Rule 702 as having three major requirements. *Yoder v. Sportsman's Guide, Inc.*, No 2:14-cv-937, 2015 WL 7009547, at *6 (W.D. Pa. Nov. 12, 2015) (citing *Pineda*, 520 F.3d at 244; *Kannankeril*, 128 F.3d at 806). First, the proffered witness must be qualified as an expert. *Pineda*, 520 F.3d at 244. Second, the expert must testify about matters requiring scientific, technical, or specialized knowledge and base his or her opinions on reliable processes and techniques. *Id.*; *In re Paoli R.R. Yard Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). Third, the expert's testimony must assist the trier of fact. *Pineda*, 520 F.3d at 244.

First, the qualification prong "requires that the witness possess specialized expertise." *Id.* (citing *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)); *Daubert*, 509 U.S. at 592-93. The Third Circuit has interpreted this requirement liberally. *Id.* (citing *Paoli*, 35 F.3d at 741). Here, the qualifications of Kassekert and Vangura are not in question.

"The second requirement is that of reliability." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 788 (3d Cir. 2009) (citing *Daubert*, 509 U.S. at 589). The Third Circuit has identified several factors for courts to consider in making the reliability determination:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally acceptable; (6) the relationship of the technique to methods which have been

established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* (citing *Paoli*, 35 F.3d at 742 n.8).

The reliability inquiry is flexible, and the relevance of each factor depends on the nature of the issues and the subject of the testimony. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The reliability inquiry is designed "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. "The analysis of the conclusions themselves is for the trier of fact when the expert is subject to cross-examination." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999).

The third element—that the expert's testimony would assist the trier of fact—"goes primarily to relevance." *Meadows*, 306 F. App'x at 790 (quoting *Lauria v. Amtrak*, 145 F.3d 593, 599 (3d Cir. 1998)). This is also referred to as the "fit" requirement. *See Daubert*, 509 U.S. at 591. "The standard for the factor is not high; it is met where there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Id.* (quoting *Paoli*, 35 F.3d at 745); *see also In re TMI Litig.*, 193 F.3d at 670 ("[A]dmissibility depends, in part, on a connection between the expert opinion offered and the particular disputed factual issues in the case."). "[E]xpert testimony based on assumptions lacking factual foundation in the record is properly

excluded under the fit requirement." *Meadows*, 306 F. App'x at 790 (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

### 3. Kassekert's Expert Testimony is Inadmissible and Will Be Excluded, and Vangura's Expert Testimony is Admissible and Will Not Be Excluded

Whiting Door, C & S Grocers, and MTM argue that the testimony and expert reports of Kassekert and Vangura must be excluded because they are inadmissible under Federal Rule of Evidence 702 and *Daubert*.[8]

### A. Kassekert's Expert Testimony is Inadmissible

The Court finds that the expert report and testimony of Kassekert must be excluded because Kassekert's conclusions do not meet the reliability standard in Rule 702 and *Daubert*, 509 U.S. at 589.

The Motion to exclude Kassekert's report and testimony does not question Kassekert's expertise and qualifications. (ECF No. 76 at 7.) Rather, the Motion challenges the reliability of Kassekert's opinions. (*Id.*) Specifically, the movants argue that "Kassekert discussed no testing, experiments, calculations, or other methodology utilized to arrive at his conclusion that the design of Whiting's strap attachment is defective." (*Id.* at 2.)

---

[8] It is within the discretion of a district court to determine whether a hearing is necessary to determine if a proffered expert's testimony satisfies Rule 702 and *Daubert*. *See Padillas*, 186 F.3d at 417-18; *Westport*, 2012 WL 161131, at *4 n.5. Here, the Court finds that it is unnecessary to hold a hearing on the admissibility of Plaintiff's proffered expert testimony. The parties did not request a *Daubert* hearing. Moreover, the Court is satisfied that the briefing on the expert testimony in this case is sufficient to decide the Motions *in Limine*.

In response, Plaintiff argues that Kassekert is qualified to render expert opinion because of his educational and practical engineering experience.[9] (ECF No. 94 at 3, 6.) Plaintiff also argues that Kassekert did not need to perform testing on the Trailer door because the door was tested through its day-to-day use. (*Id.* at 4.) However, Plaintiff does not effectively argue that Kassekert employed a sufficient methodology in reaching his conclusions. Plaintiff instead focuses on Kassekert's qualifications—which are not in dispute—by reiterating that Kassekert has "practical experience in working with rivets and metals" and that "basic principles of engineering govern the attachment of one metal part to another." (*Id.* at 5-6.)

The Court will exclude Kassekert's report and testimony because his opinions are unreliable under Rule 702 and *Daubert*. Kassekert's report summarizes the facts of the case and then concludes that the Trailer's door-strap design is inadequate and that a safer alternative design is feasible. (ECF No. 75-2 at 4-5.) In his report, Kassekert's methodology and conclusions are spelled out in only three paragraphs. (*See id.*) Kassekert did not perform calculations, tests, or experiments to support his conclusions and does not provide any data that supports his assertions.[10]

Moreover, Kassekert admits that he reached his opinions based only on his intuition. In his deposition, Kassekert testified that he arrived at his conclusions by

---

[9] Plaintiff argues that "defendants in this matter totally ignore the educational background of Mr. Kassakert [*sic*] and all of the practical experience he has in engineering, particularly the attachment of one metal part to another." (ECF No. 94 at 3.) However, the movants do not question Kassekert's qualifications or expertise. (*See* ECF No. 76.)

[10] In his deposition, Kassekert was asked if he performed "any type of experiments, tests, or calculations to reach any of the conclusions." Kassekert confirmed that he did not perform any experiments, tests, or calculations to reach or support his conclusions. (ECF No. 76 at 10.)

"looking at how the strap is attached and thinking logically that may not be the best way to do it." (ECF No. 76 at 5.) *See Oddi*, 234 F.3d at 158 (finding that expert's conclusions were inadequately supported where he did not conduct tests, experiments or calculations, and used "little, if any, methodology beyond his own intuition"); *Westfield*, 2012 WL 1611311, at *6 (excluding expert's unsupported opinions where expert offered no support for his conclusion "apart from the fact that he himself said it").

Nonetheless, the Court will analyze Kassekert's methodology based on the factors enumerated by the Third Circuit. This is challenging given that Kassekert's report is so devoid of any description of his methodology.

First, Kassekert's methods may consist of testable hypotheses. *Meadows*, 306 F. App'x at 788. It is possible to test the strength of the door strap to determine whether its design is adequate for daily use. It is also possible to test the feasibility of Kassekert's proposed alternative design. Tests and calculations would show whether rivets attach a door strap more securely than bolts. However, Kassekert did not conduct this type of testing or reference any other tests supporting his conclusions.

Second, there is no evidence that Kassekert's methods have been subject to peer review. *Id.* Plaintiff argues that "a simple Internet search will demonstrate that numerous treatises have been written about the efficacy of bolts versus rivets." (ECF No. 94 at 6.) This argument is unconvincing, though, because Kassekert does not cite any peer-reviewed literature or explain how it supports his conclusions.

Third, Kassekert does not discuss the known or potential rate of error of his methodology. *Meadows*, 306 F. App'x at 788. He does not compare the strength of rivets and bolts, or discuss whether rivets are stronger than bolts in all scenarios. He also does not state how much more effective the bolt door-strap design would be than the rivet design, let alone discuss the potential rate of error in such an analysis.

Fourth, Kassekert does not mention "the existence or maintenance of standards controlling the technique's operation." *Id.* Again, Kassekert does not provide any information on the standards for his methodology. He does not provide data or information to show that the Trailer's door-strap design was ineffective. Similarly, he does not provide any information on design standards or the comparative strength of bolts and rivets. Therefore, it is impossible to assess the reliability of Kassekert's conclusions.

Fifth, Kassekert does not establish that his methodology is generally accepted or establish that "the relationship of the technique to methods which have been established to be reliable." *Id.* Kassekert does not discuss generally accepted engineering or design methods, let alone analyze their relationship to his conclusions.

And finally, Kassekert does not mention any non-judicial uses to which his methods have been put. *Id.* For example, Kassekert does not state that bolts are commonly used instead of rivets in the design of other objects.

After considering these factors, the Court finds that Kassekert's report and testimony are clearly unreliable. Kassekert's testimony and report are based on

"subjective belief or unsupported speculation rather than methods or procedures of science." *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d Cir. 2008).

Moreover, courts have consistently excluded this type of expert testimony as unreliable. In products liability cases involving alternative designs, "testing is crucial." *Ortiz v. Yale Materials Handling Corp.*, No. 03-3657, 2005 WL 2044923, at *7 (D.N.J. Aug. 24, 2005). Courts have consistently excluded expert testimony on alternative designs where the expert did not test the alternative design. *See Oddi*, 234 F.3d at 158; *Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 221 (E.D. Pa. 2001) (excluding expert's opinions on alternative design where the expert "merely examined the toaster oven and concluded that it could have been safer"); *Ahner v. Black Bros. Co., Inc.*, No. 06-1523, 2008 WL 2880382, at *2 (W.D. Pa. May 11, 2008) (noting that expert testimony should be excluded where expert does not put forth a reliable methodology or test actual alternative designs).

In conclusion, the Court finds that Kassekert's report and testimony must be excluded under Rule 702 and *Daubert*. Accordingly, the Court will **GRANT** the Motion *in Limine* to Exclude the Testimony of David Kassekert, P.E. (ECF No. 75.)

## B. Vangura's Expert Testimony is Admissible

The Court finds that the expert report and testimony of Vangura satisfy the requirements of Rule 702 and *Daubert*. Vangura's testimony is based on reliable scientific methods and is the type of expert testimony that is appropriate in this case.

The Motion to exclude Vangura's expert report and testimony does not question Vangura's qualifications, but instead argues that his testimony should be excluded

because his opinions are unreliable and do not fit with the issues in this case. (*See* ECF No. 73.) The movants argue that "Vangura's opinions are based on sheer speculation and conjecture." (*Id.* at 2.) They argue that his opinions lack factual foundation because he did not conduct testing or experiments. (*Id.* at 7.) They highlight instances in Vangura's deposition testimony where he uses indefinite language like "maybe" or "probably." (*Id.* at 4.)

In response, Plaintiff argues that Vangura's testimony is reliable because Vangura "looked at Mr. Hook's medical records, was familiar with the injuries and the biomechanical factors involved in acquiring those injuries[,] and arrived at a scenario for how Mr. Hook fell." (ECF No. 87 at 5.) Plaintiff points out that Vangura analyzed "body position, center of mass, and the movements that Mr. Hook would have gone through in the process of closing the door." (*Id.* at 5.)

The Court finds that Vangura's conclusions are supported by reliable methods. Vangura's report details his analysis of Mr. Hook's injuries and the calculations he used to hypothesize how those injuries were caused. (ECF No. 72-2 at 5.) Moreover, the reliability factors weigh strongly in favor of admitting Vangura's testimony.

First, Vangura's methods consisted of testable hypotheses. *Meadows*, 306 F. App'x at 788. Vangura hypothesized the amount of force necessary for Mr. Hook to sustain the types of injuries that he suffered. (ECF No. 72-2 at 5.) Vangura also hypothesized how Mr. Hook's body must have been positioned before the fall to sustain his injuries. (*Id.*)

Both of these hypotheses are testable through calculations and an analysis of Mr. Hook's injuries.

Second, Vangura's methods have been subject to peer review. *Meadows*, 306 F. App'x at 788. Vangura cites three peer-reviewed journal articles that support his conclusions. (ECF No. 72-2 at 4-5 n.1-3.) The articles deal with the biomechanical properties of brain and spinal injuries. (*Id.*)

Third, Vangura does not state the known or potential rate of error for his methods. *Meadows*, 306 F. App'x at 788. However, he does state that "variability" is a typical biomechanical standard, and his calculations approximate certain values. (ECF No. 72-2 at 3.) For example, Vangura calculated "the impact velocity to be about 6.5 m/s." (*Id.*) In later calculations, Vangura used "head impact speed ranging between 6-7 m/s." (*Id.*) Therefore, it appears that Vangura's calculations do account for a range of possibilities.

Fourth, there are generally accepted methods and standards that control Vangura's biomechanical analysis. *Meadows*, 306 F. App'x at 788. His analysis is primarily based upon "injury mechanisms" such as impact, dynamic overload, crushing, or shearing. (*Id.*) Vangura explains that each injury mechanism is a combination of kinematic and kinetic variables such as position, velocity, magnitude, direction, location, and variability. (*Id.*) These mechanisms and variables are widely accepted biomechanical concepts. *See, e.g.,*

Mary M. Rogers & Peter R. Cavanagh, *Glossary of Biomechanical Terms, Concepts, and Units*, 64 PHYSICAL THERAPY 1886 (1985).[11]

Fifth, the biomechanical techniques that Vangura used are closely related to reliable biomechanical methods. *See Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 335 (M.D. Pa. 2009) (finding that biomechanical engineer's opinion "that the forces Plaintiff sustained in the subject collision were sufficient to cause a brain injury and a cervical region injury" was based on "techniques [that] were sufficiently established to be reliable"); *Robertson-Armstrong v. Robinson Helicopter Co., Inc.*, No. 13-2810, 2015 WL 7294823, at *3 (E.D. Pa. Nov. 19, 2015) (admitting testimony of biomechanics expert and noting that "biomechanics experts typically evaluate the injury mechanism . . . and provide an explanation of why injuries occurred in a given accident").

Sixth, Vangura's extensive biomechanical background weighs in favor of the admissibility of his testimony. *See Boring v. Cabela's, Inc.*, No. 08-1574, 2011 WL 43018, at *4 (W.D. Pa. Jan. 6, 2011) ("The fact that Vangura is qualified to render such an opinion argues in favor of finding his opinions to be sufficiently reliable."); *Goyal v. Thermage, Inc.*, WDQ-08-0020, 2011 WL 4380657, at *10 (D. Md. Sept. 16, 2011) (denying motion to exclude Vangura's opinions and conclusions).

Finally, the field of biomechanics has been applied in many non-judicial contexts. Vangura provides an extensive list of the non-judicial applications of biomechanics. (ECF

---

[11] As of January 2019, this article is available at http://osteopathichistory.com/pdfs/GlossaryBiomechanicalTerms_PT.pdf.

No. 72-2 at 3.) Accordingly, the Court finds that the reliability factors weigh strongly in favor of admitting Vangura's testimony.

The Court also finds that Vangura's testimony is fit to the issues in this case. There is a clear scientific connection between Vangura's opinion and the disputed issues in this case. *Paoli*, 35 F.3d at 741. Further, Vangura's opinions have a solid factual basis, which further weighs in favor of their fitness. *Meadows*, 306 F. App'x at 788.

The other arguments to exclude Vangura's testimony are directed at the weight of the evidence, and not the admissibility of Vangura's conclusions or his methodology. Evaluating the weight of the evidence is properly left to the jury. For instance, the argument that Vangura's conclusions are inconsistent with his deposition testimony is properly left to cross-examination. *See Hayduk v. City of Johnstown*, No. 3:2005-cv-294, 2009 WL 3335339, at *2 (W.D. Pa. June 4, 2009) (Gibson, J.) ("[E]vidence that is admissible although questionable, or shaky, can of course be tested and challenged through the traditional and appropriate means of cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."); *Daubert*, 509 U.S. at 596.

Accordingly, the Court will **DENY** the Motion *in Limine* to Exclude Testimony of Albert Vangura, Jr. (ECF No. 72.)

## B. Motions for Summary Judgment

### 1. The Court will Grant Summary Judgment for Whiting Door on Mr. Hook's Strict and Negligent Products-Liability Claims (Counts I and II)

Whiting Door is entitled to judgment as a matter of law on Plaintiff's claims that the Trailer's door-strap attachment was defectively designed.

To prevail on a products-liability action under Pennsylvania law, a plaintiff must prove that: (1) the product was defective; (2) that the defect existed at the time the product left the manufacturer's control; and (3) that the defect was a substantial factor in causing the plaintiff's injury.[12] *Marino v. Maytag Corp.*, No. 02-cv-2085, 2005 WL 2403638, at *3 (W.D. Pa. Sept. 29, 2005); *Sherk v. Daisy-Heddon*, 450 A.2d 615, 619-20 (Pa. 1982); *Tincher v. Omega Flex, Inc.*, 104 A.2d 328, 357 (Pa. 2014).

Here, the Court finds that Plaintiff is unable to introduce evidence that creates a genuine dispute of material fact on the first element of his products-liability claims. Plaintiff attempted to use Kassekert's testimony to show that the design of the Trailer's door strap was unsafe for its intended purpose and that a safer alternative design existed. However, as previously discussed, the Court will exclude Kassekert's testimony under Rule 702 and *Daubert* because it is unreliable. Other than Kassekert's proposed testimony, Plaintiff does not offer other evidence to establish that a design defect existed.

---

[12] In this case, given the Court's decision to exclude the testimony of David Kasskert, the Court will not differentiate between Plaintiff's strict products liability claim and negligent products liability claim. The distinction is irrelevant given that Plaintiff concedes that his products-liability claims must be dismissed if the Court grants either Motion *in Limine*. For a discussion of the difference between products liability claims under strict liability and negligence theories, see *Dunlap v. Fed. Signal Corp.*, 194 A.3d 1067 (Pa. Super. 2018).

Plaintiff admits that Whiting Door is entitled to summary judgment if the Court excludes Kassekert's testimony. In his response to Whiting Door's Motion for Summary Judgment, Plaintiff concedes that "if one or both of the Motions *in Limine* are granted, then [Whiting Door's Motion for Summary Judgment] must also be granted." (ECF No. 92 at 3.)

Accordingly, the Court finds that Whiting Door is entitled to summary judgment on Plaintiff's products-liability claims. Plaintiff has not produced any competent evidence to show that the Trailer's door-strap was defectively designed. Therefore, there is no genuine dispute of material fact on this issue, and the Court will **GRANT** Whiting Door's Motion for Summary Judgment. (ECF No. 69.)

### 2. The Court Will Grant Summary Judgment for MTM on Whiting Door's Third-Party Contribution and Indemnification Claim

Because the Court finds that Whiting Door is entitled to summary judgment on Plaintiff's products-liability claims, MTM is also entitled to summary judgment on Whiting Door's third-party contribution and indemnification claim against it.

In its support of its Motion for Summary Judgment (ECF No. 80), MTM points out that its Motion for Summary Judgment "is wholly contingent upon Plaintiff establishing liability on the part of one or both Original Defendants [Whiting Door and C & S Grocers]." (ECF No. 81 at 13.)

Accordingly, because the Court finds that Whiting Door is entitled to summary judgment on Plaintiff's products-liability claims, MTM is entitled to summary judgment on Whiting Door's third-party claims. Therefore, the Court will **GRANT** MTM's Motion

for Summary Judgment (ECF No. 80) with respect to Whiting Door's third-party claims against MTM.

### 3. The Court will Deny Summary Judgment on Mr. Hook's Negligence Claim Against C & S Grocers

C & S Grocers is not entitled to judgment as a matter of law on Mr. Hook's negligence claim against it (Count III) because there is a genuine dispute of material fact as to whether the negligence of C & S Grocers caused Mr. Hook's injuries. (*See* ECF No. 1 ¶¶ 51-63.)

To prevail on a negligence claim under Pennsylvania law, a plaintiff must establish four elements: (1) a duty or obligation recognized by the law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of the duty or failure to conform to the standard by the defendant; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) actual loss or damage resulting to the plaintiff. *Catlin v. Hamburg*, 56 A.3d 914, 920 (Pa. Super. Ct. 2012) (quoting *Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 72-73 (Pa. Super. Ct. 2006)); *Wright v. Eastman*, 63 A.3d 281, 284 (Pa. Super. Ct. 2013); *Trask v. Olin Corp.*, 298 F.R.D. 244, 264 (W.D. Pa. 2014); *Kinney-Lindstrom v. Med. Care Availability & Reduction of Error Fund*, 73 A.3d 543, 563 n.17 (Pa. 2013).

C & S Grocers argues that it is entitled to summary judgment on Mr. Hook's negligence claim because Mr. Hook does not establish any of the four elements of negligence. (ECF No. 79 at 7-12.) The Court disagrees.

### a. C & S Grocers Had a Duty to Mr. Hook

First, the Court finds that C & S Grocers had a duty and obligation to maintain the Trailer and keep it in running condition. It is well-established that "[a] duty can arise from common law, by statute, or by contract." *AMCO Ins. Co. v. Emery & Assoc., Inc.*, 926 F. Supp. 2d 634, 642 (W.D. Pa. 2013) (quoting *Emerson v. Adult Cmty. Total Servs., Inc.*, 842 F. Supp. 152, 155 (E.D. Pa. 1994)); *Farabaugh v. Pa. Turnpike Comm'n*, 911 A.2d 1264, 1283 (Pa. 2006).

Under the Dedicated Motor Carrier Agreement between C & S Grocers and Mr. Hook's employer, Ruan, "C & S shall furnish Trailer to [Ruan] that are [*sic*], to the best of C & S's knowledge at the time of interchange, in good and running order and mechanical condition, and in compliance with relevant Federal, State, and local motor carrier safety regulations."[13] (ECF No. 74-26 at 38.) Further, the Dedicated Motor Carrier Agreement stated that "[a]ll maintenance and repair to the Trailers shall be performed solely by C & S or its designated service provider." (*Id.* at 39.) Accordingly, the Court finds that C & S Grocers had a contractual duty to ensure that the Trailer was in working order.

### b. The Jury Must Determine if C & S Grocers Breached its Duty to Mr. Hook

Second, the Court finds that C & S Grocers may have breached its duty to provide Mr. Hook with an operable trailer. Typically, "the question of whether there is a breach of

---

[13] C & S Grocers mischaracterizes the Dedicated Motor Carrier Agreement. (ECF No. 79 at 7.) C & S argues that Ruan, not C & S, had a duty under the agreement to inspect the strap and trailer. (*Id.*) However, Ruan only had a duty to notify C & S of defects or damage to trailers. (*Id.* at 2.) Under the agreement, it is clear that *all* repairs were to be made by C & S Grocers, and more importantly that C & S had a contractual duty to provide Ruan with trailers that were "in good and running order and mechanical condition." (ECF No. 74-26 at 38.)

duty is a question of fact reserved for the jury." *Emerich v. Phila. Ctr. for Human Dev., Inc.,*

720 A.2d 1032, 1044 (Pa. 1998); *Walters v. UPMC Presbyterian Shadyside,* 187 A.3d 214, 221

(Pa. 2018). Summary judgment is appropriate, however, where a rational fact finder could

not conclude that defendant breached its duty of care. *Vanesko v. Marino Dist. Dev. Co.,*

*LLC,* 38 F. Supp. 3d 535, 541-42 (E.D. Pa. 2014). Here, the Court finds that a reasonable

juror could conclude that C & S Grocers breached its duty to provide Mr. Hook with a

safe and operable trailer. Accordingly, the Court will leave this issue to the jury.

### c. The Jury Must Determine if C & S Grocers Negligence Caused Mr. Hook's Injuries

Third, the Court finds that C & S Grocers's breach of duty may have caused Mr.

Hook's injuries. "Negligent conduct is not a ground for recovery unless it is a substantial

factor in bringing about the plaintiff's injury." *Burnside v. Abbott Labs.,* 505 A.2d 973, 979

(Pa. Super. Ct. 1985) (citing *Hamil v. Bashline,* 392 A.2d 1280, 1284 (Pa. 1978); *Heck v.*

*Beryllium,* 226 A.2d 87, 90 (Pa. 1966); *Cuthbert v. City of Phila.,* 209 A.2d 261, 263 (Pa. 1965)).

"It is not enough that a negligent act may be viewed, in retrospect, to have been one of the

happenings in a series of events leading up to an injury." *Polett v. Pub. Commc'n, Inc.,* 83

A.3d 205, 212 (Pa. Super. Ct. 2013) (citing *Eckroth v. Pa. Elec., Inc.,* 12 A.3d 422, 427 (Pa.

Super. Ct. 2010)).

"The question of what is the cause of an accident is almost always one of fact for

the jury." *Bleman v. Gold,* 246 A.2d 376, 380 (Pa. Super. Ct. 1968) (quoting *Ashby v. Phila.*

*Elec. Co.,* 195 A. 887, 889 (Pa. 1938)); *Hamil,* 392 A.2d at 1284; *Feeney v. Disston Manor*

*Personal Care Home, Inc.,* 849 A.2d 590, 595 (Pa. Super. Ct. 2004). To resolve questions of

causation, the "fact-finder must consider not only what *did* occur, but also what *might* have occurred." *Hamil*, 392 A.2d at 1281. "Whether . . . defendant's negligent conduct was a substantial factor in bringing about the plaintiff's harm is normally a question of fact for the jury, and should only be removed from the jury's consideration where it is clear, as a matter of law, that reasonable minds could not differ on the issue." *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1371 (3d Cir. 1993) (quoting *Alumni Ass'n v. Sullivan*, 535 A.2d 1095, 1098 (Pa. 1987)).

Here, Mr. Hook admits that he does not remember how he fell. (ECF No. 90 at 3-4.) However, as previously discussed, Mr. Hook has produced reliable expert testimony by Vangura as to the potential cause of the accident. Therefore, the chain of causation is not attenuated or dependent upon unproven contingencies. It is thus inappropriate to grant summary judgment in favor of C & S Grocers.

A reasonable jury could infer that C & S Grocers's negligent maintenance of the Trailer door's strap caused Mr. Hook's injuries. The jury will learn that Mr. Hook sustained injuries when he fell from the Trailer. The jury will also learn that the Trailer door's pull strap was detached after Mr. Hook's fall. These facts, combined with Mr. Vangura's expert testimony on the physical forces behind the injuries that Mr. Hook sustained, could lead a reasonable jury to infer that the strap detached as Mr. Hook properly utilized it. That same reasonable jury could determine that Mr. Hook would not have fallen but for C & S Grocers's breach of its duty to keep the Trailer, including the door's pull strap, in safe and working condition. Accordingly, the Court finds that there is

a genuine dispute of material fact as to causation, and that this determination must be left to the jury.

C & S Grocers makes a number of arguments regarding causation. It firstly argues that Mr. Hook could have fallen for a number of reasons other than C & S's negligent maintenance of the strap. (ECF No. 79 at 6.) C & S Grocers points out that Mr. Hook could have lost his balance or missed a step while holding the strap and fallen, causing the strap to detach. (*Id.*) C & S Grocers also points out that Mr. Hook could have misused the strap by "parachuting" off the back of the Trailer.[14] (*Id.*) This argument fails, however, because whether "defendant's negligent conduct was a substantial factor in bringing about the plaintiff's harm is normally a question of fact for the jury." *Kleinknecht*, 989 F.2d at 1371. Thus, the jury must weigh the potential alternative causes of Mr. Hook's accident.

C & S Grocers secondly argues that MTM, and not C & S Grocers, is liable for any negligent conduct regarding the Trailer door's strap. (ECF No. 79 at 9-10.) C & S Grocers argues that MTM was an independent contractor under Pennsylvania law, and therefore that C & S Grocers cannot be liable to Mr. Hook. However, this argument fails as a matter of basic contract law. C & S Grocers may be liable for breaching its contractual duty to keep the Trailer in a safe and working condition even though C & S delegated its duties to MTM—regardless of whether MTM was an independent contractor. "Neither the delegation of a performance by an obligor, nor a contract with the obligor by the person to

---

[14] The parties refer to the term "parachuting," which is the practice of closing the Trailer's door using only the strap, and not using the strap in combination with the handle on the Trailer door. When a driver "parachutes" from the back of a trailer, he or she climbs to the ground from the trailer while holding the door's pull strap, therefore closing the door. The parties do not dispute that parachuting is an improper use of the door strap. (*See* ECF No. 79 at 6.)

whom the performance is delegated to assume the obligor's duty, extinguishes it or prevents recovery of damages from him if the duty is not performed." *Husak v. Berkel, Inc.*, 341 A.2d 174, 179 (Pa. Super. Ct. 1975) (citing *Saxe v. Feinstein*, 77 A.2d 417 (1951)).

C & S Grocers thirdly argues that other cases applying Pennsylvania law—namely *McNeill* and *Jones*—require the Court to enter summary judgment in its favor. (ECF No. 79 at 6-7 (citing *McNeill v. Ginsburg*, 28 Pa. D. & C. 4th 531, 1996 WL 767415 (C.P. 1996), *aff'd* 683 A.2d 319 (Pa. Super. Ct. 1996); *Jones v. Giant Food Stores, LLC*, No. 1:10-cv-1099, 2011 WL 6003193, at *4 (M.D. Pa. Oct. 13, 2011), *Report and Recommendation adopted by* 2011 WL 6002986 (M.D. Pa. Nov. 30, 2011).) However, these nonprecedential decisions are distinguishable from the instant case.

In *McNeill*, the plaintiff broke her ankle after she fell on muddy grass covered by wet leaves. *McNeill*, 1996 WL 767415, at *1. The court there granted summary judgment for the defendant because of the plaintiff's legal status on the defendant's property. *Id.* at *4. That ruling was affirmed on appeal. *McNeill*, 683 A.2d 319. Defendant cites *McNeill* to argue that where the plaintiff "was unable to set forth the cause of her injury with any degree of certainty . . . it is well-established that a cause of action cannot be premised upon mere speculation or conjecture." (ECF No. 79 at 6.)

*McNeill* is inapposite for two reasons. First, *McNeill* involved a premises-liability claim, which has a different standard of care. *Id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 343; *Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983). Second, the plaintiff in *McNeill* did not introduce *any* evidence of causation. *Id.* at *5. Like Mr. Hook, the plaintiff

there admitted that she did not know what caused her fall. *Id.* However, unlike Mr. Hook, the plaintiff there did not introduce expert testimony on how she fell or what caused her fall to make up for her own lack of knowledge. Thus, there are significant differences between *McNeill* and the instant case.

Similarly, in *Jones*, the plaintiff slipped and fell on an unidentified substance in a grocery store. *Jones*, 2011 WL 6003193, at *1. The plaintiff there left the store without reporting the incident. *Id.* Nobody witnessed the fall, and the plaintiff testified that she did not observe any substance on the floor. *Id.* The plaintiff did not retain the pants she wore at the time of the fall. *Id.* In her Report and Recommendation, which was subsequently adopted by the district court, Magistrate Judge Mildred Methvin granted summary judgment for the defendant grocery store. *Id.* at *6.

*Jones* and *McNeill* are inapposite for the same reasons. First, *Jones* involved a premises-liability claim, which has a different standard of care. *Id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 343; *Carrender*, 469 A.2d at 123. Second, the plaintiff in *Jones* did not prove causation, but also did not produce *any* expert testimony or other evidence of causation. *Id.* The plaintiff there did not introduce expert testimony to show how she fell or what caused her fall. Therefore, the Court finds that *Jones* is not directly on point.

In conclusion, the Court finds that Mr. Hook has produced sufficient evidence of causation to survive summary judgment on his negligence claim against C & S Grocers. The question of negligence will be properly left to the jury.

-36-

### d. There is No Dispute that Mr. Hook Sustained Injuries

Finally, as to the fourth element of negligence, there is no dispute that Mr. Hook sustained injuries on November 4, 2013. (ECF No. 82 ¶ 24-26; ECF No. 89 ¶¶ 24-26.) Accordingly, this element does not affect the Court's negligence analysis.

Therefore, because there are genuine disputes of material fact as to whether C & S Grocers was negligent, the Court will **DENY** C & S Grocer's Motion for Summary Judgment. (ECF No. 78.)

### 4. The Court will Deny Summary Judgment on C & S Grocers's Crossclaim Against MTM

As MTM points out in its Motion for Summary Judgment, "MTM has no possible liability in this action unless Plaintiff first establishes viable claims against one or both of [C & S Grocers or Whiting Door]." (ECF No. 81 at 2.) Accordingly, because Mr. Hook has established a viable negligence claim against C & S Grocers, the Court will **DENY** MTM's Motion for Summary Judgment with respect to C & S Grocers's Crossclaim against it.

### 5. The Court will Grant Summary Judgment on Mrs. Hook's Loss of Consortium Claim Against Whiting Door (Count IV), but will not Grant Summary Judgment on Mrs. Hook's Loss of Consortium Claim Against C & S Grocers (Count V)

Under Pennsylvania law, loss of consortium claims allow a married person to recover damages when his or her spouse is tortiously injured. *See, e.g., Hopkins v. Blanco,* 320 A.2d 139, 140 (Pa. 1974); *Burns v. Pepsi-Cola Metro. Bottling Co.,* 510 A.2d 810, 812 (Pa. Super. Ct. 1986); *In re Estate of Lloyd,* No. 898-WDA-2015, 2016 WL 5387466, at *5 (Pa. Super. Ct. Aug. 9, 2016).

Loss of consortium is a derivative claim that depends on a viable tort claim by the injured spouse. *Spowal v. ITW Food Equip. Grp.*, 943 F. Supp. 2d 550, 564 (W.D. Pa. 2013). Therefore, the success of a loss of consortium claim hinges on the success of the underlying claim by the spouse. *Balletta v. Spadoni*, 47 A.3d 183, 201 (Pa. Commw. Ct. 2012).

Here, Mrs. Hook's loss of consortium claim against Whiting Door (Count IV) fails as a matter of law because the Court will grant summary judgment in favor of Whiting Door on Mr. Hook's claims against it. Mrs. Hook's loss of consortium claim against C & S Grocers (Count V), on the other hand, survives because the Court will not grant summary judgment on Mr. Hook's claims against C & S Grocers.

## VII.  Conclusion

For the preceding reasons, the Court will **GRANT** the Motion *in Limine* to Exclude the Testimony of David E. Kassekert, P.E. (ECF No. 75) and **DENY** the Motion *in Limine* To Exclude the Testimony of Albert Vangura, Jr. (ECF No. 72). Further, the Court will **GRANT** Whiting Door's Motion for Summary Judgment (ECF No. 69), **DENY** C & S Grocers's Motion for Summary Judgment (ECF No. 78), and will **GRANT** MTM's Motion for Summary Judgment (ECF No. 80) **IN PART** and **DENY** it **IN PART**.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS W. HOOK and PATTI HOOK, | ) | CIVIL ACTION NO. 3:15-281 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| WHITING DOOR MANUFACTURING | ) | |
| CORP. and C & S WHOLESALE | ) | |
| GROCERS, INC., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOBILE TRAILER MAINTENANCE, LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## ORDER

AND NOW, this _14th_ day of February, 2019, upon consideration of the three

Motions for Summary Judgment (ECF Nos. 69, 78, 80) and two Motions *in Limine* (ECF

Nos. 72, 75) before the Court, **IT IS HEREBY ORDERED** as follows:

(1)  The Motion *in Limine* to Exclude Testimony of David Kassekert, P.E. (ECF
     No. 75) is **GRANTED**;

(2)  The Motion *in Limine* to Exclude Testimony of Albert Vangura, Jr. (ECF No.
     72) is **DENIED**;

(3)  Whiting Door Manufacturing Corp.'s Motion for Summary Judgment (ECF
     No. 69) is **GRANTED**;

(4)  C & S Wholesale Grocers, Inc.'s Motion for Summary Judgment (ECF
     No. 78) is **DENIED**; and

(5)     Mobile Trailer Maintenance LLC's Motion for Summary Judgment (ECF
        No. 80) is **GRANTED IN PART** and **DENIED IN PART**. Mobile Trailer
        Maintenance LLC's Motion is **GRANTED** with respect to Whiting Door
        Manufacturing Corp.'s claims against it and **DENIED** with respect to C & S
        Wholesale Grocers, Inc.'s claims against it.

Accordingly, Counts I, II, and IV of Mr. Hook's Complaint fail as a matter of law.


**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**